**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 25-10067-T |
| ASHER HOMES, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor-in-Possession. | ) | |

**EXECUTIVE HOMES, LLC'S JOINDER AND BRIEF IN SUPPORT OF UNITED
STATES TRUSTEE'S SUPPLEMENT TO MOTION TO CONVERT CASE TO
CHAPTER 7 AND REQUEST FOR HEARING (DKT # 412)**

Executive Homes, LLC ("Executive") hereby joins the United States Trustee's

("U.S. Trustee") Supplement to Motion to Convert Case to Chapter 7 and Request for

Hearing (Dkt. # 412) and the underlying Motion to Convert Case to Chapter 7 (Dkt. # 110).

In further support of the U.S. Trustee's request for conversion, Executive states the

following:

**BACKGROUND**

This case has been plagued by the Debtor's gross mismanagement and bad faith

conduct from the outset. A brief history of what has occurred in this case is instructive:

1.       As a reorganization effort this case was doomed from the outset. There were

no employees, no ongoing business operations and no regular income. There was nothing

to reorganize. Liquidation was the only option. While Chapter 11 can be used for

liquidation it was clear from the number of fraud lawsuits pending against the Debtor and

its principal Daniel Ruhl that there was not a groundswell of support for Daniel Ruhl to be

the person in charge of that process. Now a year and a half later, the Debtor still has no

employees, no ongoing operations, and no regular income. It has added substantial unpaid

administrative costs.    The creditors still object to Daniel Ruhl's involvement in the liquidation of assets.

2.      This case was filed as a Chapter 11 on January 20, 2025. Within eight days of filing, the Debtor filed a Motion to Establish Codebtor Stay (Dkt. # 20). That Motion sought to impose automatic stay protections for the Debtor's principal, Daniel Ruhl, eight of Mr. Ruhl's other companies, and another individual that worked for him, John Wealer. (*Id*. at 9).  According to the Debtor, this request would have halted proceedings against those "codebtors" in at least 36 cases. The Debtor argued repeatedly throughout the Motion that the "codebtor stay" was necessary for "reorganization". (*See* Motion at 7, 8, and 9 (stay needed to "avoid prejudice toward Debtor's ability to reorganize.").  As referenced above "reorganization" was never really feasible in the case.  The true motive of this Motion was to give Mr. Ruhl the protection of the automatic stay without the necessity of filing himself and putting his personal assets at risk.

3.      That motion drew four objections, including from the United States Trustee. On the day before of the hearing, after the parties had spent time and money preparing for the hearing, the Debtor filed a motion to withdraw the effort at establishing a "codebtor stay" (Dkt. 67).[1]

4.      On May 16, 2025, the Debtor filed a motion to extend the exclusivity period to file its "Plan of Reorganization". (Dkt. 118 at 1). In that motion, the Debtor stated that "Debtor's representative is meeting with a group of Colorado investors on Monday, May

---

[1]      This would not be the last time the parties were forced to incur significant effort and expense only to see an ill-fated motion be withdrawn at the last minute.

19, 2025 who will likely be providing an offer to purchase the bulk of Debtor's assets. Debtor would like to know the result of that meeting before filing a plan." (*Id*. at 2).

5.     It is now apparent from documents produced by Paradigm Land Corp. in response to a subpoena that the referenced meeting was with Paradigm's principal, Jeff Mark. At that meeting, Mr. Ruhl, the Debtor's principal, was "invited to offer any opportunities that we could consider doing together and *your terms for running a building company owned by our company*." (Paradigm Documents, Exhibit A, p. 10 (emphasis added)). This relationship is discussed more below.

6.     The day after the meeting, on May 20, 2025, Debtor filed its Chapter 11 *liquidation* plan. The debtor did not seek reorganization despite its prior representations that a "codebtor stay" was intended to preserve its ability to reorganize.  The Plan proposed that the Debtor be dissolved and then the assets be sold.  Although not expressly stated, the implication was that Mr. Ruhl would manage the liquidation without the involvement of a trustee or any form of liquidation trust that could be managed for the benefit of creditors. This Plan and the accompanying Disclosure Statement have been on file for over a year with no effort to set them for a hearing or move forward with them.

7.     The day after that, May 21, 2025, Debtor filed two motions to sell free and clear of liens. One of those motions sought approval to sell 11535 S. Marion Ave., Tulsa, OK, to Ruhl Properties, LLC, another company owned by Daniel Ruhl (Dkt. 127). The second of the two motions sought approval to sell 6640 E. 127th Place S., Bixby, OK, to Jason and Dana Rush (Dkt. 129). The Court denied the sale to Ruhl Properties, LLC after

3

strong opposition (Dkt. 189), but the Court granted the sale motion for 6640 E. 127th Place S.  (Dkt. 188).

8.　　It turns out, the buyer of 6640 E. 127th Place S., Jason Rush, was at the time of the sale motion (and remains) counsel for the Debtor's affiliate, Precision Project Management, Inc., another company owned by Mr. Ruhl.[2] Mr. Rush also currently represents Mr. Ruhl in his pending criminal case brought by the Oklahoma Attorney General, in which Mr. Ruhl is charged with felonies in connection with his operations of the Debtor.[3] Nowhere in the sale motion or in the hearings on that motion was there ever any disclosure of the relationship between Mr. Rush, the buyer, and Mr. Ruhl and his other companies.

### The Paradigm Land Corp. Sale Motions

9.　　On October 17, 2025, Debtor filed a motion to sell nine properties to Paradigm Land Corp. for an aggregate amount of $3,735,782. (Dkt. # 256). The sale motion stated that "[n]o representations, express or implied, concerning the Property are or have been made by Debtor other than what is set forth in the LOI." (*Id*. at 3).  The Court granted that sale motion after an evidentiary hearing. (Dkt. 332).

10.　　Paradigm Land Corp.'s subpoena production shows that, a few months before that sale motion was filed, Paradigm was in discussions with Debtor's principal, Mr. Ruhl, regarding a business partnership.

---

[2]　　　*See* https://www.oscn.net/dockets/GetCaseInformation.aspx?db=tulsa&number=CJ-2024-4452&cmid=3739092.

[3]　　　See　　　https://oscn.net/dockets/GetCaseInformation.aspx?db=tulsa&number=CF-2026-232&cmid=3846757.

11.     Specifically, Mr. Ruhl proposed the following to Jeff Mark, Paradigm's principal, on May 22, 2025 (three days after their meeting discussed above):

> …Here is my proposal
>
> *Buy out Asher's home inventory and close down the company. This also will allow us to realize profit quickly to fund expenses
>
> *pay is based upon a profit split of 35% up to 10 million with a bonus of 1% for every 2.5 million of net income over 10 not to exceed 40%.
>
> *I will receive a monthly payment of 20k which is deducted from our quarterly profit distribution
>
> *alternative pay structure based on a flat fee per unit ordered 7500
>
> I am excited about the opportunity and I am very confident in the success of our partnership.

(Exhibit A, pp. 6-7). In other words, Mr. Ruhl was proposing that Paradigm buy out Asher's inventory at a discounted price so that it could  then be re-sold for a substantial profit to help fund expenses to jumpstart a new business venture  that would give Mr. Ruhl continued control and a lucrative salary.  It is quite clear from these negotiations Mr. Ruhl was more concerned about himself than any obligations he might have to creditors in the pending Chapter 11 case.

12.     These facts and the nature of the proposed relationship between Mr. Ruhl and Paradigm Land Corp. were not disclosed in Debtor's motion to sell the nine properties. (*See* Dkt. 256).

13.     On March 2, 2026, Debtor attempted an unprecedented maneuver by which Asher would borrow over $8 million to buy land in The Retreat subdivision in Broken

Arrow, OK, from a third party which would then purportedly be sold free and clear of Executive's interests to Paradigm for approximately $10.5 million. (Dkt. 347 and 351).

14.     That motion to borrow and motion to sell faced significant opposition from Executive and the United States Trustee as the motions were fatally defective based on the reasons set forth in the objections. One of the many issues pointed out as problematic was the $250,000 benefit that would be received by another company owned by Mr. Ruhl if the transactions at issue were to occur. (Dkt. 383 at 1-2). It appears from the documents produced by Paradigm that the personal benefit to Mr. Ruhl may have been far greater. (See Exhibit A, pp. 1; 2; 3-4; 6;7).

15.     The motions to borrow and sell were originally set for hearing on April 3, 2026. The parties expended significant time and money preparing for that hearing. On April 2, the day before hearing, the Debtor sought a last-minute continuance. (Dkt. 396). The hearing was rescheduled for April 17, 2026. (Dkt. 400). The parties once again spent time and money preparing for the hearing. On April 13, 2026, the Debtor filed a motion to withdraw the motion to borrow and motion to sell, evidently recognizing they had no chance of success on the merits. (Dkt. 403 and 404).

16.     Once again, the relationship (the extent of which is still unknown) between Mr. Ruhl and Paradigm Land Corp. were not disclosed in Debtor's motion to borrow and motion to sell The Retreat land. (*See* Dkt. 256).

17.     Recently, Debtor has filed another motion to sell properties to Paradigm Land Corp. (Dkt. 408). That motion is set for hearing on June 29, 2026. The motion contains no

disclosures regarding the nature of the relationship (the extent of which is still unknown) between Mr. Ruhl and Paradigm Land Corp.

### The Rochdale Homes Sale Motion

18.    On February 23, 2026, Debtor filed a motion to sell seven properties to "Rochdale Homes, LLC". (Dkt. 333; 337). The contract attached to the sale motion contained representations on the part of the buyer, Rochdale Homes, LLC, stating the following: "Organization and Authority. *Buyer has been duly organized and validly exists as an entity in good standing in the state of its organization*, and is or will be at Closing, qualified to do business in the state in which the Land is located." (Dkt. 333-1 at 6).

19.    This representation was untrue as Rochdale Homes, LLC did not exist at the time of this filing. It was not incorporated until April 1, 2026. (Exhibit B). This begs the question of what due diligence was done by the Debtor and how this sale came about. That is not fully known because there were no disclosures in the sale motion about the relationship between the Debtor and Rochdale Homes, LLC.

20.    Both the appointment of counsel for the Debtor and an accountant for the Debtor were likewise plagued with disclosure issues. (*See* Dkt. 240 (sanctioning Debtor's counsel $7,000 for failure to disclose; Dkt. 150; 151; 157; 244 (repeated issues regarding disclosure of relationship between accounting firm and Debtor/Mr. Ruhl's various entities).

### <u>ARGUMENT</u>

Viewed in combination, the Debtor's repeated failures to disclose, its pursuit of relief not permitted under the Bankruptcy Code, and wasting of the parties' and the Court's time and resources amount to gross mismanagement of the estate and conduct rising to the

level of bad faith. The Code permits conversion of this case to Chapter 7 or dismissal for gross mismanagement and bad faith conduct.

A motion to dismiss or convert a Chapter 11 case is governed by 11 U.S.C. § 1112(b), which provides that the court shall convert or dismiss the case, whichever is in the best interests of creditors and the estate, upon a showing of "cause." § 1112(b)(1). The statute establishes a burden shifting framework. The movant must first establish cause, and once cause is shown, the court must grant relief unless the debtor satisfies the exception in § 1112(b)(2).

Section 1112(b)(4) lists examples of cause, including "continuing loss to or diminution of the estate and the absence of a reasonable liklihood of rehabilitation" and "gross mismanagement of the estate." Courts uniformly hold the list is illustrative, not exhaustive, and that bad faith and abuse of the bankruptcy process constitute independent grounds for cause. *In re C.M. Heavy Machinery, LLC*, 671 B.R. 309 (Bankr. E.D. Okla. 2025). The moving creditor bears the burden of proving cause by a preponderance of the evidence, after which the burden shifts to the debtor to demonstrate unusual circumstances under § 1112(b)(2).

Although not expressly listed in § 1112(b)(4), bad faith is a recognized basis for dismissal or conversion. *In re RHA Stroud, Inc.*, 2020 WL 7787034, * 10 (Bankr. W.D. Okla. 2020). Courts analyze bad faith through the debtor's compliance with fiduciary duties and the accuracy and honesty of the information presented to the Court. A debtor in possession acts as a fiduciary and "holds its powers in trust for the benefit of the creditors." *In re Modern Office Supply*, 28 B.R. 943 (Bankr. W.D. Okla. 1983).

The Debtors' systematic failures to disclose pertinent information, especially regarding facts that would warrant heavy scrutiny of the sale transactions that have been proposed, warrant conversion or dismissal.

"The three most important words in the bankruptcy system are: disclose, disclose, disclose." *Sanchez v. Ameriquest Mortg. Co. (In re Sanchez)*, 372 B.R. 289, 305 (Bankr. S.D. Tex. 2007). Nothing in the Bankruptcy Code prohibits a sale to insiders. However, insider sales are subject to "heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." *In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015). This is because insiders "usually have greater opportunities for ... inequitable conduct." *Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991). *See also In re Tidal Const. Co., Inc.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) ("[E]ven when parties are completely forthright with the facts surrounding the transfer, § 363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse.").

At every turn, the Debtor has attempted to use this liquidation to maximize value for Mr. Ruhl, his other companies, and his friends and insiders—all at the expense of the estate and its creditors. In that regard, the Debtor's repeated meritless filings have cost creditors massively in unnecessary attorney fees. This is especially true with respect to the now-withdrawn motions to borrow and sell The Retreat land, which had no good faith basis in law or fact. Moreover, none of the properties that have been sold appear to have been marketed in any way. While a broker has received payment for services in at least one sale, according to the parties' private discussions, the use of that broker appears to have been

purely a matter of optics for a deal already agreed upon by the parties. (*See* Exhibit A, p. 3 (Question from Jeff Mark of Paradigm: "Why are you paying Frisbie Lombardi?" Answer from Daniel Ruhl: "It is cleaner to hand [sic] a broker involved"). Nearly all of the sales that have occurred, appear infected by undisclosed insider status. And, as the United States Trustee's Motion to Convert shows, that may have impacted the amount of equity that could be obtained for the potential benefit of creditors.

In most instances, the Debtor has failed to disclose facts sufficient for the parties and Court to determine that these sales should have even been subject to heightened scrutiny because of the buyer's insider status. The Court in *In re Roussos*, 541 B.R. 721, 730 (Bankr. C.D. Cal. 2015) explained the importance of scrutinizing such sales:

> A sale to insiders is fundamentally different from a sale at arms-length. In an arms-length transaction, the asset's exposure to the marketplace insures that the price is reasonable. Insider sales, by their very nature, lack this characteristic. Insiders do not have an incentive to aggressively market the assets to obtain the highest price. Their incentive is just the opposite– the less marketing, and the lower the price, the better.

And the facts, especially viewed in conjunction with the amount of equity that has been squandered by the Debtor, suggest that these were not bona fide arm's length transactions and that they were driven by factors that did not have the interests of creditors in mind.

The Debtors repeated failures to provide financial reporting are also sufficient grounds for dismissal or conversion. In *C.M. Heavy Machinery*, the debtor filed for chapter 11 right before a state court foreclosure and repeatedly submitted inaccurate monthly operating reports containing non-estate assets and inconsistent financial data. The debtor's principal acknowledged the inaccuracies but continued to sign and file the reports under

10

penalty of perjury. The court emphasized that the "cornerstone of all bankruptcy cases, but especially DIP chapter 11 reorganizations, is reliable financial information," and found that the deficiencies "undermine[d] the Court's and creditors' ability to assess the Debtor's financial condition." The court concluded that this conduct constituted gross mismanagement and a breach of fiduciary duty and found cause to convert.

In *RHA Stroud,* the debtor filed for Chapter 11 shortly after state court litigation began. The court found the case was filed in bad faith and dismissed under § 1112(b). The court determined the filings served no valid bankruptcy purpose and was instead a litigation tactic. The court observed that "where a debtor appears to be more concerned with who obtains the assets, it may be that the case is more about dodging state court foreclosure rights than a reorganization," and further noted that where "plan[s] for increasing cash flow is based on false assumptions and speculative" projections, cause exists to dismiss.

The Debtor has exhibited a pattern of conduct that is inconsistent with its fiduciary status and can only be explained by improper motive. It is equally clear that no "rehabilitation" of the Debtor is possible while Mr. Ruhl is still involved. It is long past the time to pull the plug on this case. Cause exists for the Court to dismiss or convert this case to a Chapter 7 liquidation so that control can be put in the hands of a qualified neutral.

Respectfully submitted,


/s/ Timothy T. Trump

_____

Timothy T. Trump, OBA No. 10684
CONNER & WINTERS, LLP
15 E. 5th Street, Ste. 4100
Tulsa, OK 74103
Telephone: (918) 586-8513
ttrump@cwlaw.com

***Attorneys for Executive Homes, LLC***


## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of June 2026, I electronically transmitted the foregoing document to the Clerk of the Court using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

/s/ Timothy T. Trump

_____

Timothy T. Trump

12